RICHARD ROE, casual ejector, and JACOB WATSON, tenant in possession, plaintiffs in error, vs. JOHN DOE, *ex dem.*, JOSHUA TINDAL, et al., defendants in error.

JOHN DOE, *ex dem.*, JOSHUA TINDAL, et al., plaintiffs in error, vs. RICHARD ROE, cas. ejector, and JACOB WATSON, tenant in possession, defendants in error.

[1.] The exemplified copy of a deed recorded in 1836, but without proof of its execution—the grantor signing his name by his mark—is not admissible in evidence, especially when it does not satisfactorily appear that the original ever existed.

[2.] A Sheriff's deed must be accompanied by the execution under which the land was sold, or the judgment upon which it issued.

[3.] A. being in possession of land, claiming it *bona fide* as his own, is informed by B., that the lot belongs to C. Whereupon, A. authorizes B. to buy the land for him of C. This is no attornment to C., especially when it turns out that C. was not the owner of the land.

[4.] A., under a parol gift from B., enters upon the possession of a lot of land and some five years thereafter, B. executes to A. a quit claim deed to the lot. *Held*, That the title does not relate back so as to constitute adverse possession; to the extent of the boundaries in the deed, from the time when A. took possession under the parol gift.

[5.] Where the lessor of the plaintiff in ejectment is dead at the time the action is brought, there can be no recovery upon his demise; where he dies intermediate the bringing and trial of the suit, costs only can be recovered.

[6.] The civil law will presume a person to be living at a hundred years of age; and the common law does not stop much short of this.
Where the plaintiff in ejectment is examined as a witness, and testifies, that inquiry having been instituted by his counsel as to the death of the grantee of the land; he is informed by him and believes that he is dead, and that the action is prosecuted in the name of the grantee, for his benefit alone, this is evidence upon which the jury have a right to find that the grantee is dead; and it is error in the Court not to instruct them accordingly, when requested to do so.

Ejectment, from Baker county. Tried before Judge ALLEN, November Term, 1857.

This was a motion for a new trial.

An action of ejectment was brought by James S. Patillo

against Jacob Watson, to recover a tract of land which had been granted to Joshua Tindal, a revolutionary soldier, in 1831.

Upon the trial, the plaintiffs introduced the following testimony:

The grant from the State of Georgia to Joshua Tindal, (revolutionary soldier,) of Murphey's district, Washington county, dated the 17th day of October, 1831, for lot of land No. 110, in the 9th district of Early county.

*William Griffin*, who swore, that the defendant was in possession of the land at the time the action was brought, and that Stephen Merrett settled it in 1846, and remained exercising acts of ownership over and cultivating it, as men who own land usually do, until Watson went into possession under him, (Merrett,) and was in possession of the whole lot, and built houses on the north half. Watson went into the possession of the south half, as purchaser, in 1851, and Patillo told witness that he had purchased the other half from Merrett; lot of land was never divided, but Dry creek ran through it; Baker went into possession under Patillo, and McLaren under Baker, and Bond under McLaren, who was then in possession of the north half of the lot.

The plaintiff then introduced a deed from Humphrey Rowel to Thomas J. Hand, for lot of land No. 110, in the 9th district of Early now Baker, dated the 15th day of August, 1835.

*James B. Warren* testified, that Merrett told him in 1847 or 1848, that he had written to Hand to purchase the land for him; Merrett built a house on the land in 1845; Benjamin O. Keaton gave Merrett the lot of land in 1842 or 1843; and soon afterwards Merrett entered on the land and exercised acts of ownership over it; never heard Merrett disclaim owning the land; before Merrett settled the lot of land it was known and claimed as Benjamin O. Keaton's.

Plaintiff then closed, and defendant introduced,

*James Patillo,* the plaintiff, who swore, he believed that

Joshua Tindal, the drawer of the lot of land, was dead, and that the suit was proceeding for his (Patillo's) benefit alone. Henry Morgan, his attorney, had told him that he had written to Washington county to ascertain the fact, and that the information he received was, that Joshua Tindal was dead. That Merrett told him that he had sold Watson one-half of the lot of land, and that he (Patillo) bought Merrett's claim to the other half, to prevent him from claiming the lot of land which had been levied on under a *fi. fa.* against Thomas J. Hand, which he controlled, and that he gave Merrett $300 for the same; made a contract with Merrett to purchase the land, and told Merrett that Hand owned it, and Merrett requested him to see Hand and see if he could by it.

*Stephen Merrett* swore, that he settled the lot of land in 1844, and exercised acts of ownership over it, and had no doubt but that it was his, until Patillo told him it was Hand's; built upon it and cultivated it till he sold, and put Watson into possession of part of it; Keaton gave him the lot of land in 1843, and told him that Keaton and Howard usually purchased any lot of land that was sold at Sheriff's sale, that did not bring more than the cost; that one was Sheriff and the other Deputy Sheriff; that he owned the land; that he did not remember the number, but that when he found out the number he would give him a deed to it; witness never contracted to sell the lot or one-half of it to Patillo, till he (witness) came to Newton to forbid the sale, when Patillo purchased one-half of the lot for $300. Witness had before sold the other half to Watson for $50, and so informed Patillo at the time; Patillo told him that the land was Hand's, and asked him if he would give $50 for it, and witness said he would, but thought he had the title; witness heard nothing of Patillo or Hand until the levy of the *fi. fa.*

*Leonard S.* ——— stated, that he had known the lot of land since 1846 or 1847; that Merrett lived on it and cultivated it; told Patillo that Watson purchased one-half before Patillo purchased the other half.

Defendant then introduced the answers of *Benjamin O. Keaton*, to interrogatories, to the following effect: Knew Watson but not Patillo; purchased a lot of land in the 9th district of Baker county, at Sheriff's sale, number not recollected; on account of kindness and favors extended to him by Stephen Merrett, witness gave the lot of land to Merrett, and at the time, designated the number purchased at the sale; made no title to the land to Merrett, but a quit claim of the same to him; thinks the lot of land was sold at the Sheriff's sale as the property of the drawer; Merrett had stated to witness that he had settled on the lot of land; received no valuable consideration for the land from Merrett.

A deed dated the 9th of July, 1850, from Stephen Merrett to Jacob Watson, for the half of the said lot of land south of the dry creek.

A deed dated the 1st of July, 1850, from Benjamin O. Keaton to Stephen Merrett, for the whole of said lot of land, and closed.

Plaintiff in reply introduced a deed dated 3d of September, 1850, from Stephen Merrett to James S. Patillo, for the half of the said land north of the dry creek.

The evidence being closed, defendant's counsel requested Court to charge the jury, " That if the land was given to Merrett by Keaton at any time in 1844, or at any other time, and no title was made by Keaton at the time of the gift, but if Keaton subsequently made a title in pursuance of and by virtue of said gift, then the paper title so made subsequently by Keaton, related back to the time of the gift." Which charge the Court refused to give, and the defendant excepted.

Defendant's counsel requested the Court to charge, " That the age of Tindal, as disclosed by the grant, (as a revolutionary soldier,) and the evidence of the plaintiff Patillo, are matters for their consideration, and if by these or any other testimony, the jury are convinced that Joshua Tindal is dead,

the jury cannot find on his demise;" which the Court refused to charge, and defendant's counsel excepted.

Defendant requested, in writing, the Court to charge, "That if the plaintiff Patillo has received information of the death of Tindal, and he believes it to be true, and if the present action is now proceeding for the sole benefit of Patillo, then the information and belief are entitled to much consideration from the jury;" which the Court refused to charge, and the defendant's counsel excepted.

Defendant requested the Court to charge, " That if Merrett went into possession under Keaton, and with expectation of title from Keaton, and took possession under such expectation in 1844 or 1st January, 1845, claiming title to the whole lot, and possession continued in him and Watson for 7 years before action brought, the title would be good in him." This charge the Court refused to give, and defendant's counsel excepted.

The defendant requested the Court to charge the jury, " That if Merrett took possession of the lot of land under the contract with Keaton, and continued the possession, and Keaton afterwards, and while Merrett was in possession, made him a deed under and in fulfilment of said contract, then the deed related back to the time of the original purchase or contract between Keaton and Merrett;" which the Court refused to give, and defendant's counsel excepted.

Defendant requested the Court to charge, " If possession commenced January 1st, 1845, in Merrett, under and by virtue of the gift from Keaton, and in 1850 Keaton made him a title in fulfilment of his promise, then this title enured to Merrett's benefit, and related back to his first possession on the 1st of January, 1845, or whenever he went into the possession under the gift and made his first, possession the time from which the statute of limitations commenced to run." The Court refused to give this charge, and defendant excepted.

The jury found for the plaintiff; whereupon, counsel for the defendant moved the Court for a new trial, on the following grounds:

1st. That the jury found contrary to law.

2d. That the jury found contrary to evidence.

3d. That the jury found contrary to the charge of the Court, in this, that the Court charged the jury, "That if they were satisfied by the evidence, that Joshua Tindal was dead at the commencement of the action, that they should find for defendant on his demise."

4th. That the Court erred in its charge to the jury in this: the Court charged the jury, "That the written title by Keaton to Merrett made in 1850, could not relate back to the time of the first possession of Merrett, though the deed was made in pursuance of his engagement to make the title before Merrett went into possession, and though Merrett went into possession upon the faith of his agreement to make the title to him."

5th. Because the Court refused to charge the jury, as requested, "That the age of Tindal as disclosed by the grant, ("revolutionary soldier,") and the evidence of the plaintiff Patillo, are matters for their consideration, and if from these the jury are convinced that Joshua Tindal is dead, then the jury cannot find on his demise."

6th. "That if Patillo has received information of the death of Tindal, and he believes that he is dead from this information, and if this action is now proceeding for the sole benefit of Patillo, then the information and belief are entitled to much consideration from the jury, on the question of the death of Joshua Tindal."

7th. "That if Merrett gave a quit claim to Watson, and expressed to Watson apprehension or fears as to his title, by saying that Patillo told him that Hand had title, which induced him to fear his own, then whatever disclaimer of title founded on the misrepresentation of, Patillo, cannot effect Merrett's right to the land."

8th. " That if Merrett went into possession under Keaton, and with expectation of a title from Keaton, and took possession under such expectation in 1844 or 1st January, 1845, claiming title to the whole lot, and possession continued in him and Watson for 7 years before action brought, the title is good in Merrett and Watson."

9th. " That if Merrett went into the possession, and Keaton afterwards, in fulfilment of his promise, made him a title in 1850, this title enured to his benefit and related back to his first possession in 1844, or 1st January, 1845, or whenever he went into possession under the gift, and made his first possession the time from which the statute, as to the whole land, commenced to run."

The Court refused the new trial on all the grounds taken, and defendant's counsel excepted.

### Plaintiff's Exceptions.

Upon the trial, Jacob Watson and Peter J. Strozier, under a notice served upon them, swore that they knew nothing about a deed from Joshua Tindal to Humphrey Rowel to said land.

*James Patillo* testified, that he believed that there had been in existence a deed from Tindal to Rowel for the land in question; that he had made diligent search for the same and could not find it, and believed it had been destroyed, and that the witnesses were dead.

Plaintiff then proposed to read a record, under the official signature of the Clerk of the Superior Court of Baker county, of a deed dated the 7th of October, 1822, and purporting to be a conveyance with warranty of the lot of land in question, (No. 110,) from Joshua Tindal to Humphrey Rowel.

The defendant objected to this record being read in evidence, it not having been proved that the deed was proved or acknowledged according to law. The Court sustained the objection, and plaintiff excepted.

The plaintiff then proposed to read it simply as evidence of the payment of the consideration money, and as a receipt for the same. The Court overruled the motion, and plaintiff excepted.

Plaintiff then read in evidence, a deed dated 15th September, 1835, from Humphrey Rowel to Thomas J. Hand.

The plaintiff then proposed to read in evidence, a Sheriff's deed dated 3d September, 1850, containing this recital: "Whereas, in obedience to a writ of *fieri facias*, issued out of the Superior Court of the county of Muscogee, at the suit of Jeremiah McCoy against Thomas J. Hand, I, James Johnston, &c."

The defendant objected to the reading of the deed, because it was not accompanied by the *fieri facias*, under which the sale had been made. The Court sustained the objection, and the plaintiff excepted.

Upon the conclusion of the testimony, counsel for plaintiff requested the Court in writing to charge as follows:

1st. That the defendant, in order to show statutory title must satisfy the jury that he took possession under some color of title, and *bona fide* claimed the land as his own for seven years, and that he held possession of it the full length of that time, continuously, notoriously, and adversely.

2d. That if Keaton purchased the land in dispute at his own sale, while acting as Sheriff, the sale was void, he having no right to purchase at his own sale; and, therefore, any title he may have made to Merrett is void, and will not even amount to a color of title under which a statutory title can be set up.

3d. If Merrett, holding under such a title, had held the possession of the land for 7 years, claiming it as his own, it would not give him a statutory title to it.

4th. If Merrett admitted title in Hand during the time he held possession, he admitted himself tenant under Hand, and the jury must so find, if they believe plaintiff held title through Hand.

All these charges the Court refused to give, and plaintiff excepted.

STROZIER; and WARREN & WARREN, for defendant below.

H. MORGAN, *contra*.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] The plaintiff tendered in evidence, a certified copy of what purported to be a deed from Joshua Tindal to Humphrey Rowel, dated 7th October, 1822, and recorded the 28th of May, 1836: Joshua Tindal making his mark to the deed, and it purports to have been witnessed by Adam and Williamson, neither of whom attest the instrument officially. Nor is it proven or acknowledged before any body. The Court rejected the copy for any of the purposes for which it was offered—either as an authentic copy of a conveyance executed according to law, or as an ancient paper, or as an acknowledgment of the payment of the purchase money for the land, so as to vest the equitable title in Rowel.

The case of *Winn and others against Patterson*, 5 *Peters*, 232, *and* 6 *Peters*, 663, are relied on to justify the introduction of this paper. But there is a fundamental difference between the proof of the power of attorney in that case, and the deed in this. The power of attorney purported to be signed and sealed in the presence of Abram Jones, J. P., and Thomas Howard, Jr. It was admitted that Jones was a Justice of the Peace at the time, and William Robinson, the D. Clerk who recorded the deed, testified that he knew the hand writing of Abram Jones, and that his signature was genuine.

What evidence is there here, that there ever was an original deed? For aught that appears to the contrary, this deed may have been executed in 1836, at the time it was recorded. It is not officially attested. It is proven by nobody. And to crown all, Tindal signs his mark only.

[2.] The objection to the deed from Johnson to Patillo' was well taken; no judgment or *fi. fa.* being shown.

[3.] Counsel for plaintiff requested the Court in writing to charge the jury, that if Merrett admitted title in Hand during the time he held possession of the land, he admitted himself tenant under Hand, and could not dispute Hand's title.

We do not think the proof justified this request. Patillo informed Merrett that Hand owned the land; Merrett replied that he had supposed that he himself was the true owner; but that if the land was Hand's, he would buy it; and he authorized Patillo to give Hand $50 for the land. Surely this is not attorning to Hand, or acknowledging himself as Hand's tenant.

There are but two questions in the other bill of exceptions which we deem necessary to notice.

[4.] Merrett went into possession of the land in dispute in January, 1845, under the parol gift from Keaton. In 1850, Keaton made him a quit claim deed. Did that relate back to 1845, and take effect from the commencement of Merrett's possession, so as to constitute adverse possession in Merrett to the whole lot?

No authority has been cited to justify this position, and we think it against principle; and consequently hold, that Merrett was restricted to his *possessio pedis*, or actual occupation of the premises, which seems from the proof to have been limited to the north half of the lot, which is not in controversy.

[5.] The other question grows out of the refusal of the Court to charge as requested, as to the manner of proving the death of Tindal, and its effect upon the action. The Judge was requested to instruct the jury, that if Patillo received information as to the death of Tindal, and believed it to be true, and that the case was proceeding for the benefit of Patillo alone, that these facts were entitled to much consideration from the jury. On the contrary, the Judge charged the jury, that they must be satisfied that Tindal was dead *at*

*the commencement* of the suit, and the fact of his death must be proven by persons acquainted with him.

It is now the law of this Court, as settled by several adjudications, that if the lessor of the plaintiff be dead *at the time of trial,* no recovery can be had on his demise. If he be alive at the commencement of the suit, and die before trial, cost only can be recovered. If dead at the time suit was brought, there can be no recovery in his name of any thing.

As to the mode of proving the death, it is certainly not restricted, as the Court charged, to the acquaintances of the deceased. But without discussing this point, let us direct our attention to the facts in this case, and enquire whether the information and belief of Patillo, as to the death of Tindal, are to be considered as proof against him, and to what extent?

We remark, that the information and belief of a mere witness, would not suffice, and would even be ruled out as incompetent testimony. But Patillo is a party to the action; a lessor of the plaintiff. Does that make a difference?

By a careful examination of all the Acts passed by the Legislature, authorizing a party to be examined at common law, it will be seen that his testimony is treated as the answer of a defendant in equity, to a bill for discovery. In equity, the defendant answers to the best of his knowledge, information, and belief. Information and belief fall short of knowledge, still they are testimony, and a Court of Equity might decree upon such an answer, it being warranted in believing, whatever the party believed to be true against his interest. At any rate, a Court of Chancery would attach importance to such an admission.

Now then, Patillo, declaring as he did, under oath, in this case, that from information obtained through General Morgan, his counsel, upon inquiry instituted in Washington county, the former residence of Joshua Tindal, that he, Patillo, believed that Tindal was dead, the jury were entitled at least to have this testimony fairly submitted to them, under

a proper charge from the Court, and we think the Court erred in refusing to give it.

[6.] The presumption arising from the extreme old age of Tindal, is not conclusive as to his death.   The civil law will presume a person living at a hundred years of age, and the common law does not stop much short of this.   2 *Greenleaf,* § 278 *c. and notes ; Best on Presumptions,* 139 ; *Benson vs. Olive,* 2 *Strange,* 920.

The foregoing points must control this case, and we have neither the time nor the inclination to notice all the changes rung upon them, in the hundred and one requests to charge, embodied in the bill of exceptions.   In that " Pandora's Box" of evils, the New Trial Act of February, 1854, the clause most pregnant with mischief, is that which makes it obligatory *to* grant a re-hearing in all cases where the presiding Judge shall refuse to give a legal charge, in the language requested, when the charge so requested is submitted in writing.   This one Act has more than doubled the delay and cost of litigation in Georgia, without possessing one redeeming feature of public benefit.

New trial granted.